T.C. Memo. 2011-141

UNITED STATES TAX COURT

ESTATE OF NATALE B. GIUSTINA, DECEASED,
LARAWAY MICHAEL GIUSTINA, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10983-09.                    Filed June 22, 2011.

<u>D. John Thornton</u> and <u>Kevin C. Belew</u>, for petitioner.

<u>Kelley A. Blaine</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The IRS issued a notice of deficiency
determining (1) a $12,657,506 deficiency in estate tax and (2) a
$2,531,501 accuracy-related penalty under section 6662 of the
Internal Revenue Code.[1]  The notice of deficiency was issued to

_____

[1]Unless otherwise indicated, all citations of sections refer
                                              (continued...)

Laraway Michael Giustina ("Larry Giustina"), the executor of the estate of his deceased father, Natale B. Giustina. Larry Giustina brings this case pursuant to section 6213(a), asking this Court to redetermine the deficiency. We refer to Larry Giustina as "the estate" when referring to him in his capacity as a party to this case. The two issues for decision are:

(1) the value of the 41.128-percent limited partner interest in Giustina Land & Timber Co. Limited Partnership owned by Natale Giustina at his death on August 13, 2005 (the estate contends the value is $12,995,000, but the IRS contends the value is $33,515,000);[2] and

(2) whether the estate is liable for the section 6662 accuracy-related penalty.[3]

---

[1](...continued)
to the Internal Revenue Code (26 U.S.C.) as in effect for the date of death, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

[2]Although the 41.128-percent limited partner interest was owned by a trust, rather than by Natale Giustina directly, the estate concedes that the value of the partnership interest must be included in the gross estate. For convenience, we sometimes discuss the partnership interest as if it was held by Natale Giustina rather than through the trust.

[3]The parties have stipulated that the marital deduction at issue is a computational issue and that the amount of the allowable marital deduction will depend on the value of the 41.128-percent limited partner interest in Giustina Land & Timber Co. owned by Natale Giustina at his death on Aug. 13, 2005. The parties also stipulated that administrative expenses incurred by the estate shall be allowable to the extent substantiated.

We find that the value of the partnership interest is $27,454,115 and that the estate is not liable for the penalty.

FINDINGS OF FACT

1. Introduction

The parties stipulated some facts; those facts are so found. Larry Giustina resided in Eugene, Oregon, when the petition was filed. The decedent, Natale Giustina, was born in 1918 and died on August 13, 2005, at the age of 87. He was a resident of Eugene, Oregon, when he died, and his estate is administered in the State of Oregon.

Natale Giustina was the trustee of the N.B. Giustina Revocable Trust.[4] The trust owned a 41.128-percent limited partner interest in Giustina Land & Timber Co. Limited Partnership. This partnership is sometimes referred to here as "the partnership".

2. History of the Giustina Family and Its Business: 1917 to 1989

Erminio Giustina was the father of Natale Giustina, the decedent. In the summer of 1917, Erminio Giustina and two of his brothers entered the lumber industry. The three brothers bought a lumber mill in Molalla, a small town in Clackamas County, Oregon. In the 1920s the brothers moved their base of operations to Lane County, Oregon, where they were joined by another

---

[4]Natale Giustina's middle initial was "B".

brother, Anselmo. Over time, the Giustina family bought land and mills around Eugene, the largest town in Lane County. The family business was operated through several entities.

Until the 1960s the family timberlands were held by Giustina Bros., a partnership. In the 1960s the timberlands that contained young trees were transferred from Giustina Bros. to a newly formed partnership called Giustina Timber Co. The shares of Giustina Timber Co. were then transferred to heirs of the original four brothers. The mills, meanwhile, were owned by Giustina Bros. Lumber & Plywood, a corporation that employed 200 people.

For many years the family business was run by Natale Giustina and his brother, Ehrman Giustina. The Giustina family eventually sold all of its mills. By 1988 the Giustina family's business holdings consisted primarily of timberlands owned by Giustina Bros. and by Giustina Timber Co.

3. Formation of Giustina Land & Timber Co. in 1990

By the time the mills closed, the family business was managed by two family members: Larry Giustina, who was the son of Natale Giustina, and Dan Giustina, who was the son of Ehrman Giustina. The two cousins found that their managerial roles were redundant and that they had conflicting ideas about how to run the business. They therefore proposed to divide the family properties so that they each would manage separate properties.

Their proposal was adopted by the other members of the family. As a result, the assets of the family business entities, Giustina Bros., Giustina Timber Co., and Giustina Bros. Lumber & Plywood, were transferred to three new partnerships, each of which was owned by a separate set of Giustina family members.

The first new partnership was Giustina Land & Timber Co. Limited Partnership. This partnership received 51.875 percent of the assets of (1) Giustina Bros. and (2) Giustina Timber Co. The parties have stipulated that this partnership was owned by "the Natale Giustina and Anselmo Giustina families, as well as another relative named Dolores Fruiht". The value of a 41.128-percent limited partner interest in this partnership is the major issue in this case.

The second new partnership was Giustina Resources. This partnership received 30.625 percent of the assets of (1) Giustina Bros. and (2) Giustina Timber Co. The parties have stipulated that this partnership was owned by "members of the Ehrman Giustina family". It was operated by Dan Giustina.

The third new partnership was Giustina Woodlands. It received 17.5 percent of the assets of (1) Giustina Bros. and (2) Giustina Timber Co. The parties have stipulated that this partnership was owned by "the Greg Giustina family".

The extended Giustina families made every effort to ensure not only that the assets were divided according to each family's

proportionate ownership interests in Giustina Bros. and Giustina Timber Co., but also that the timber species, revenues, and income were divided in the same manner. Even though substantially all of its assets were distributed, the Giustina Bros. partnership remained in existence. All of the assets of Giustina Timber Co. were distributed.

4.  <u>Operations and Ownership of Giustina Land & Timber Co</u>.

Giustina Land & Timber Co. was formed effective January 1, 1990. The partnership was governed by a written partnership agreement from the day the partnership was formed. The agreement has been amended several times since then. Unless otherwise noted, all provisions of the partnership agreement that we discuss were in effect when Natale Giustina died in August 2005.

The partnership agreement provides that the general partners have full control over the business of the partnership. The general partners have the power to sell the partnership's timber, land, and other property. The general partners also have the power to make distributions of cash or property to the partners in proportion to each partner's respective interest in the partnership. All decisions of the general partners must be made with the concurrence of a majority of the general partners.

The partnership agreement initially provided that the general partners were Larry Giustina and Ansel James Giustina, their survivors, and any other person admitted to the partnership

as an additional general partner in accordance with the provisions of the agreement. Ansel James Giustina is the son of Anselmo Giustina. We refer to him as James Giustina.

The partnership agreement allows a general partner to voluntarily resign. A general partner can be removed by the concurrence of limited partners owning two-thirds of the interests in the partnership. If a general partner resigns or is removed, a successor general partner may be designated by the limited partners owning two-thirds of the interests in the partnership. An additional general partner can be admitted to the partnership if all the partners consent to the admission.

The partnership agreement allows a limited partner interest to be transferred to (1) another limited partner, (2) a trust for the benefit of a limited partner, or (3) any other person approved by the general partners. A limited partner may not withdraw from the partnership unless all of the limited partner's interests have been transferred.

The partnership agreement provides that the partnership will continue to exist until December 31, 2040, unless the partnership is terminated earlier pursuant to section 12.2 of the partnership agreement. Section 12.2 provides that the partnership shall be dissolved: (1) automatically on December 31, 2040, (2) if the limited partners fail to designate a successor general partner within 90 days after the resignation or removal of the sole

general partner, or (3) if the limited partners owning two-thirds of the interests in the partnership vote to dissolve the partnership.  If the partnership is dissolved, its affairs must be wound up, its assets may be sold, and its assets and any proceeds from the sale of assets must be distributed to its partners in accordance with their capital accounts.

Schedule A of the original partnership agreement listed the limited partners when the partnership was formed in 1990:

| Limited Partner | Number of Units |
| --- | --- |
| N.B. Giustina | 44.128 |
| Anselmo Giustina | 31.940 |
| Dolores Giustina Fruiht | 4.809 |
| Natalie Giustina Newlove | 4.198 |
| L.M. Giustina | 3.195 |
| Irene Giustina Goldbeck | 4.198 |
| Sylvia B. Giustina | 3.266 |
| A.J. Giustina | 2.266 |
| Total | 98.000 |

Each general partner owned one unit in his capacity as a general partner.  N.B. Giustina refers to Natale Giustina, the decedent. Anselmo Giustina died in 1993.  Dolores Giustina Fruiht's exact relationship to the other partners is not revealed by the record. Natalie Giustina Newlove is a daughter of Natale Giustina.  L.M. Giustina, we infer, refers to Larry Giustina, i.e., Laraway Michael Giustina.  Irene Giustina Goldbeck is a daughter of

Natale Giustina.  Sylvia B. Giustina, we infer, is the sister of James Giustina and the daughter of Anselmo Giustina.  A.J. Giustina refers to James Giustina, i.e., Ansel James Giustina.

A buy-sell agreement, dated November 21, 1994, bars a limited partner from transferring a partnership interest unless (1) the transfer is to a member of the transferring partner's family group, or (2) the transferring partner offers the other limited partners the right of first refusal.  For these purposes, there are three family groups:

- "Sylvia B. Giustina, A.J. Giustina, children of Sylvia B. Giustina, and children of A.J. Giustina."

- "N.B. Giustina, Natalie Giustina Newlove, L.M. Giustina, Irene Giustina Goldbeck, and children of Natalie Giustina Newlove, L.M. Giustina, and Irene Giustina Goldbeck."

- "Dolores Giustina Fruiht, her children, and grandchildren."

The provisions of the buy-sell agreement were in effect in August 2005.

On January 1, 2002, Larry and James Giustina resigned as general partners.  Each was replaced by a limited liability company.  LMG, LLC, is controlled by Larry Giustina.  AJG, LLC is controlled by James Giustina.

Some transfers of limited partner interests occurred after formation of the partnership. The parties stipulated that as of August 13, 2005, the partnership had the following owners:

### Ownership of Giustina Land & Timber Co. as of Aug. 13, 2005

| | Percentage Interest |
|---|---|
| **General Partners:** | |
| LMG, LLC | 1.000 |
| AJG, LLC | 1.000 |
| **Limited Partners:** | |
| N.B. Giustina, Trustee of the N.B. Giustina Revocable Trust | 41.128 |
| Sylvia B. Giustina | 17.236 |
| A.J. Giustina | 16.236 |
| Natalie Giustina Newlove | 5.198 |
| Irene Giustina Goldbeck | 5.198 |
| Dolores Giustina Fruiht | 4.809 |
| L.M. Giustina | 4.195 |
| Anselmo Giustina Family Trust | 4.000 |
| Total | 100.000 |

Under the terms of the N.B. Giustina Revocable Trust agreement, Natale Giustina had the right to revoke the trust or to withdraw the principal and accumulated income of the trust estate. The terms of the trust agreement required that the trust's 41.128-percent limited partner interest be distributed as follows at Natale Giustina's death: 17 percent to Natalie

Giustina Newlove, 17 percent to Larry Giustina, 17 percent to the Irene Giustina Goldbeck Trust, and 49 percent to the N.B. Giustina Marital Trust.

By August 13, 2005, Giustina Land & Timber Co. owned 47,939 acres of timberland in the area of Eugene, Oregon. It employed approximately 12 to 15 people. Three or four worked in forestry; four worked on the roads crew; and six worked at administrative tasks. Although James Giustina and Larry Giustina both controlled general partners of the partnership (their respective LLCs), the primary decisions regarding the management of the timber were made by Larry Giustina. James Giustina provided assistance to Larry Giustina in the decisionmaking.

5.  Tax Reporting, Notice of Deficiency, and Positions of the Parties

Natale Giustina died on August 13, 2005. He was survived by his spouse, Jacqueline L. Giustina, and his three children: Natalie Giustina Newlove, Larry Giustina, and Irene Giustina Goldbeck. On the estate tax return, the value of the 41.128-percent limited partner interest was reported to be $12,678,117. On April 3, 2009, the IRS issued the notice of deficiency determining a $12,657,506 deficiency and a $2,531,501 accuracy-related penalty under the provisions of section 6662. The notice of deficiency determined that the value of the 41.128-percent limited partner interest was $35,710,000. The notice made a computational adjustment to the marital deduction claimed on the

return.  At trial, the IRS contended that the value of the limited partner interest was $33,515,000 (a lesser amount than it had earlier determined).  The estate contended that the value of the limited partner interest was $12,995,000 (a greater amount than it had reported on its return).

OPINION

Generally, the taxpayer has the burden of disproving the determinations in the IRS notice of deficiency.  Rule 142(a)(1).  The IRS has the burden of proof regarding any factual issue for which the taxpayer has presented credible evidence and met other requirements.  Sec. 7491(a)(1).  Our conclusions, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial.  See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

1.   Introduction

Each party called an expert witness to opine on the value of the 41.128-percent limited partner interest.  Of the methods used by the expert witnesses, we believe that there are two appropriate methods that are helpful in valuing that interest.  The first method (the cashflow method) is based upon how much cash the partnership would be expected to earn if it had continued its ongoing forestry operations.  The operations, which consisted of growing trees, cutting them down, and selling the logs, have historically generated almost all of the partnership's

cashflows. The second valuation method (the asset method) is based upon the value of the partnership's assets if they were sold. The value of the timberlands, which constitute most of the partnership's assets, is agreed to be $142,974,438. The value includes a 40-percent discount for the delays attendant to selling the partnership's approximately 48,000 acres of timberland.

2.   The Cashflow Method

   a.   The Expert Witnesses

Both expert witnesses relied in part on the cashflow method to determine the value of Natale Giustina's interest in the partnership. John Thomson, the IRS expert, estimated that the partnership's annual cashflow would be $9,979,969 in the first year after Natale Giustina's death. He estimated that the total future cashflows, once discounted to present value, would be $65,760,000. Robert Reilly, the estate's expert, estimated that annual cashflow would be $4,560,000 in the first year after Natale Giustina's death. He estimated that the total future cashflows, once discounted to present value, would be $33,800,000.

   b.   Calculation of Cashflows

Thomson's cashflow estimates were not persuasive. First, as Reilly explained on pages 17-18 of his rebuttal report, there was an internal inconsistency between Thomson's cashflow estimates

and his calculation of the effect of lack of control on the value of the 41.128-percent limited partner interest. The inconsistency led Thomson to overvalue it. Second, Thomson unrealistically assumed that the partnership's operating expenses would remain fixed, even though he projected that its revenues would increase 3 percent annually. Third, Thomson's estimate of annual cashflows was extrapolated from the actual cashflow results of the most recent year. By contrast, Reilly extrapolated from the cashflow results of five consecutive years. Reilly's use of five years of data is sounder because it reduces the effect of a temporary variation in cashflow. But Reilly's application of the cashflow method to value the partnership interest has its own problems. As we explain, however, his computations can be adjusted.

One problem with Reilly's computations is that he reduced each year's predicted cashflows by 25 percent to account for the income taxes that would be owed by the owner of the partnership interest on that owner's share of the partnership's income. The 25-percent reduction is inappropriate because the rate at which Reilly discounted the cashflows to present value was a pretax rate of return, not a posttax rate of return. An appraiser should not reduce cashflows by income tax while simultaneously using a pretax rate of return to discount the cashflows to present value. Gross v. Commissioner, T.C. Memo. 1999-254, 78

T.C.M. (CCH) 201, 209, affd. 272 F.3d 333 (6th Cir. 2001).  Thus, Reilly's cashflow estimates must be recomputed to eliminate the 25-percent discount for income tax liability.

c.   The Discount Rate

Another problem with Reilly's application of the cashflow method is that the rate at which he discounted the cashflows to present value--18 percent--was too high.  As we explain below, the discount rate should be 16.25 percent.

Reilly's 18-percent discount rate had four components.  Only the fourth needs to be corrected.  The first component was the risk-free rate.  Reilly assumed that the risk-free rate was the 4.5-percent rate of return earned by owners of 20-year U.S. Treasury bonds.

The second component of Reilly's discount rate was a beta-adjusted equity risk premium.  According to Reilly, beta is a "measure of the systematic risk (i.e., risk relative to returns in a measure of the overall equity market, such as the S&P 500 index) inherent in a company's investment returns."  Reilly determined that the risk premium for an equity investment in the S&P 500 common stock index was 7.2 percent.  Reilly estimated that the beta for an investment in companies in the timber industry was 0.56.  He then estimated that a beta of 0.5 was appropriate for the partnership because it had less debt than

other timber companies.  He therefore calculated a beta-adjusted risk premium of 3.6 percent (7.2 percent x 0.5).

The third component of Reilly's discount rate was a small stock equity risk premium.  Reilly estimated that this component was 6.4 percent.  Reilly calculated that an investment in a small company, defined as a company with a total equity capitalization between $1.4 million and $263 million, had an annual return of 6.4 percent above the overall equity risk premium exhibited by the S&P 500 common stock index.

The fourth component of Reilly's 18-percent discount rate was a partnership-specific risk premium of 3.5 percent.  Reilly explained that this risk premium was justified because the partnership's timberlands were not geographically dispersed.  All were in Oregon.  He also explained that the partnership's operations were nondiversified.  The partnership's sole source of revenue was timber harvesting.  Thus, it is apparent that a portion of the 3.5-percent premium reflects the unique risks of the partnership.  But unique risk does not justify a higher rate of return.  Investors can eliminate such risks by holding a

diversified portfolio of assets.[5]  We conclude that the

partnership-specific risk premium should be only 1.75 percent.

After this adjustment is made, the correct discount rate is

16.25 percent.  This is equal to the sum of 4.5 percent, 3.6

percent, 6.4 percent, and 1.75 percent.[6]

Reilly reduced his 18-percent discount rate by 4 percent to

reflect his assumption that cashflows would increase by 4 percent

each year.  After making this reduction, his "direct

capitalization rate" was 14 percent.  We have no dispute with the

---

[5]Richard A. Brealey and Stewart C. Myers explain:

> The risk that potentially can be eliminated by
> diversification is called unique risk.  Unique risk
> stems from the fact that many of the perils that
> surround an individual company are peculiar to that
> company and perhaps its immediate competitors.  But
> there is also some risk that you can't avoid,
> regardless of how much you diversify.  This risk is
> generally known as market risk.  Market risk stems from
> the fact that there are other economywide perils that
> threaten all businesses. * * *

Brealy & Myers, Principles of Corporate Finance 168 (7th ed.
2003) (fn. refs. omitted); see also Booth, "The Uncertain Case
for Regulating Program Trading", 1994 Colum. Bus. L. Rev. 1, 28
("Because diversification can eliminate the unique risks
associated with investing in individual companies, the market
pays no additional return to those who assume such risks.").

[6]The discount rate Thomson used in his cashflow method,
16.22 percent, is almost equal to the 16.25-percent rate that we
find to be the appropriate discount rate.  Thomson's discount
rate was equal to:  (1) a 4.52-percent risk-free rate, plus (2)
an 11.7-percent equity risk premium paid for small stocks (i.e.,
stocks in the fifth capitalization quintile of companies traded
on the New York Stock Exchange for 1926-2004).  We did not use
Thomson's method of determining a discount rate.

4-percent assumption.  Therefore, the 16.25-percent discount rate should be reduced by 4 percent, resulting in a direct capitalization rate of 12.25 percent.

        d.    <u>Value of Marketable Noncontrolling Interests in the Partnership</u>

Using the cashflow method, Reilly determined that the value of 100 percent of the interests of the partnership (on a freely marketable basis) is equal to the discounted present value of the cashflows.  Reilly estimated that the discounted present value of the cashflows was $33,800,000, but our adjustments result in an estimate of $51,702,857.  The adjustments are set forth in the table below:

<u>Valuation of All Partnership Interests on a Marketable Basis Using the Cashflow Method</u>

| | Reilly's Calculations in Exhibit 10 of His Report | As Adjusted by Court |
|---|---|---|
| Normalized pretax income | $6,120,000 | $6,120,000 |
| Normalized net income (normalized pretax income reduced 25% by Reilly for income taxes) | $4,590,000 | $6,120,000 |
| Total adjustments to estimated cashflow | -$30,000 | -$30,000 |
| Normalized net cashflow | $4,560,000 | $6,090,000 |
| Projected normalized net cashflow (normalized net cash flow, increased by long-term growth rate of 4%) | $4,743,000 | $6,333,600 |
| Direct capitalization rate | 14% | 12.25% |
| Total equity value on a marketable, noncontrolling ownership interest basis (Reilly's estimate is rounded) | $33,800,000 | $51,702,857 |

e.    Discount for Marketability

Reilly discounted the cashflows in order to reflect the inability of the owner of the 41.128-percent limited partner interest to easily sell it.  This discount for lack of marketability is 35 percent in Reilly's view.[7]  Thomson's lack-of-marketability discount was only 25 percent.  Both Reilly and Thomson formed their opinions from two types of studies:  (1) restricted-stock studies and (2) pre-IPO studies.  Thomson relied more on the restricted-stock studies because, he testified, the pre-IPO studies "tend to overstate their discount for just lack of marketability".  In particular, Thomson relied on the SEC Institutional Investor Study, a restricted-stock study that showed an average discount of 26.4 percent.  Reilly relied more on the pre-IPO studies than the restricted-stock studies.  Reilly did not rebut Thomson's testimony that the pre-IPO studies overstated the discount for lack of marketability.  We therefore adopt Thomson's marketability discount of 25 percent.

f.    Weight Given to the Cashflow Method

Reilly gave a 30-percent weight to the cashflow method.[8] Thomson gave the cashflow method a weight of 20 percent.  In our view, the cashflow method is appropriate to reflect the value of

_____

[7]Reilly testified that 25 percent was also reasonable.

[8]Reilly referred to the cashflow method as the direct capitalization method.

the partnership if it is operated as a timber company, and the asset method is appropriate to reflect the value of the partnership if its assets are sold. Accordingly, the percentage weight to be accorded the cashflow method should be equal to the probability that the partnership would continue to be operated as a timber company.

We believe that there was a 75-percent probability that the partnership would have continued its operations rather than liquidating its assets. The Giustina family had a long history of acquiring and retaining timberlands. We take this into account, but we also assume that the owner of the 41.128-percent limited partner interest is a hypothetical third party, see sec. 25.2512-1, Gift Tax Regs., who seeks the maximum economic advantage from the asset.[9] As Reilly testified, the optimal strategy to maximize the value of the partnership would be to sell the timberland and "get $143 million today." Selling the timberlands would generate about $143 million; continuing to operate the partnership would generate only about $52 million.

---

[9]As we said in Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998) (citations omitted):

> The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer. The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage.

Reilly opined that the value of the timberlands is irrelevant because a holder of Natale Giustina's interest could not unilaterally force the sale of the partnership's assets. It is true that the owner of a 41.128-percent limited partner interest could not alone cause the partnership to sell the timberlands. However, there are various ways in which a voting block of limited partners with a two-thirds interest in the partnership could cause the sale. The members of such a voting block could replace the two general partners, who have the power to sell assets and make distributions. Alternatively, a two-thirds voting block could dissolve the partnership, an act that must be followed by the distribution of the partnership's assets. We are uncertain how many partners would share the view that the timberland should be sold. The uncertainty does not prevent us from estimating the probability of the sale:

> The entire valuation process is a boundless subjective inquiry: To value an asset the court has to make guesses or assumptions about the future. These inquiries require speculation about the composition of management * * *

Repetti, "Minority Discounts: The Alchemy in Estate and Gift Taxation", 50 Tax L. Rev. 415, 445 (1995). Some of these family members would perhaps prefer that the partnership remain in operation. But people also tend to prefer $143 million to $52 million, or, in this case, a share of $143 million to a share of $52 million. We believe that there is a 25-percent probability

that a sufficient number of limited partners would cause the sale of the partnership's assets.

Conversely, there was a 75-percent probability the timberlands would not be sold. We assign a weight of 75 percent to the value of the partnership as measured by the cashflow from its continued operations.

3. Asset Method

a. Significance of Value of Timberlands and Other Assets

The timberland assets of the partnership were worth approximately $143 million. The total assets of the partnership were worth $150,680,000, according to an estimate by Thomson that is essentially unchallenged by the estate. Therefore, we assume that if the partnership had liquidated its assets and distributed the proceeds to the partners, the amount of the distribution would have been $150,680,000. This figure should be weighted by the 25-percent probability that the partners would have caused the sale of the timberlands and other assets.

b. No Discount for Lack of Control

In determining the value of the 41.128-percent limited partner interest if the timberland assets were sold, it is not appropriate to subtract a discount for the inability of the owner to control the affairs of the partnership. The IRS expert, Thomson, applied a lack-of-control discount of 12 percent. However, our calculations already assume that there was a

75-percent chance that the owner of the interest would have been unable to garner enough support from the other limited partners to sell the timberland. The inability to cause the sale of the timberland is an aspect of the lack of control.[10] Thus, lack of control is already reflected by the 75/25 percentage weighting. No additional discount is needed.

c. No Discount for Lack of Marketability

In calculating the value of the partnership interest if the assets were sold, it is not appropriate to subtract a discount for lack of marketability. A discount for lack of marketability reflects the inability of the owner of a business enterprise to quickly sell the interest.[11] But in valuing the partnership interest as if there were a sale of the timberlands, we have

---

[10] James R. Repetti writes:

Additional benefits of control, however, become available only as the percentage of stock ownership increases. For example, many state statutes require a two-thirds vote of shareholders to liquidate a corporation, sell substantially all the corporation's assets, merge the corporation or amend the certificate of incorporation. The ability to compel liquidation of a corporation or sale of its assets may be valuable if the value of the corporation's assets exceeds the value of its ongoing business. * * *

"Minority Discounts: The Alchemy in Estate and Gift Taxation", 50 Tax L. Rev. 415, 426-427 (1995) (fn. refs. omitted).

[11]As Reilly testified: "The concept of investment marketability relates to the liquidity of an investment--that is, how quickly and certainly the investment can be converted into cash at the owner's discretion."

assumed that the timberland could be sold for $143 million, a stipulated value that includes a 40-percent discount to reflect the delays in selling the land.  It would be a double discount to reduce the value further to reflect the delays in selling the partnership interest.

4.   Value of the 41.128-Percent Limited Partner Interest

In our view, the value of all interests in the partnership is equal to (75% x $51,702,857) + (25% x $150,680,000), or $76,447,143.  The discount for lack of marketability (which is applicable only to the value of the partnership interest as if the partnership continued operations, not to the value as if the timberland is sold, see supra Opinion parts 2.e and 3.c) is equal to 25% x (75% x $51,702,857), or $9,694,286.  This discount reduces the value to $66,752,857.  Multiplying $66,752,857 by 41.128 percent equals $27,454,115, which we conclude is the correct value of the partnership interest in question.  These calculations can be compared to the approaches taken by the two expert witnesses as set out in the following chart:

Valuation of the 41.128-Percent Limited Partner Interest:
Comparison of Approaches

| Methods and adjustments | Reilly (Estate Expert) | Thomson (IRS Expert) | Court |
|---|---|---|---|
| Asset-accumulation method | 10% x $51,100,000 | -- | -- |
| Cashflow method | 30% x $33,800,000 | 20% x $65,760,000 | 75% x $51,702,857 |
| Capitalization-of-distributions method | 30% x $52,100,000 | -- | |
| Price-of-shares-of-other-companies method | 30% x $59,100,000 | 20% x $99,550,000 | -- |
| Asset method | | 60% x $150,680,000 | 25% x $150,680,000 |
| Total | $48,610,000 | $123,470,000 | $76,447,143 |
| Discount for lack of marketability | 35% | 25% | 25% (applied to value from cash-flow method only, for a weighted discount of $9,694,286) |
| Discount for lack of control | 0% | 12% | 0% |
| Total after discounts | $31,597,000 | $81,490,200 | $66,752,857 |
| X 41.128% | $12,995,000 | $33,515,000 | $27,454,115 |

5.    Valuation Methods That We Did Not Adopt

     a.    Reilly's Capitalization-of-Distributions Method

     The estate's expert witness, Reilly, attributed a 30-percent weight to the value given by the capitalization-of-distributions method.  Using this method, Reilly estimated the present value of the distributions that he expected the partnership to make to the partners.  We did not attribute independent weight to this method for two reasons.  First, the cash earned by the partnership is a more reliable indicator of value than the cash distributed to the partners.[12]  Second, the capitalization-of-distributions method and the cashflow method share the assumption that the partnership would remain in operation and not liquidate its timberland holdings.  In this respect the methods are duplicative.

     b.    Reilly's Asset-Accumulation Method

     Reilly also ascribed a 10-percent weight to what he called the asset-accumulation method.  Applying this method, Reilly first aggregated the distributions that he predicted the partnership would make to the partners from 2005 until 2040, the end of the term of the partnership agreement.  Reilly then discounted these distributions to present value.  To this sum Reilly added the value of the timberlands, $143 million, as discounted to present value from the year 2040.  The asset-

_____

     [12]Undistributed cash that is used by the partnership to increase the value of the partnership assets increases the value of the limited partner interests.

accumulation method is effectively a hybrid of the capitalization-of-distributions method and the asset method. Because we reject the capitalization-of-distributions method for the reasons given in Opinion part 5.a, and because we adopt the asset method (as weighted by the probability of an asset sale), we accord no independent weight to the asset-accumulation method.

c.    Prices of Stock of Similar Companies

Reilly ascribed a 30-percent weight to what he called the "guideline publicly traded company" method.  Applying this method, Reilly used the value of two publicly traded businesses to derive the value of the interest in the partnership.  The first business was Plum Creek Timber Co., Inc., which is a real estate investment trust.  Plum Creek owned 7.8 million acres of timberlands and 10 wood product conversion facilities.  It derived only 52 percent of its revenue from timber sales.  The second business was Pope Resources LP, a partnership.  This business derived 81 percent of its revenue from timber sales. The remaining revenue was earned from two other operations: timberland consulting and a multifaceted real estate operation.

Like Reilly, Thomson used the value of other businesses to value the interest in the partnership.  He relied on four businesses:  Plum Creek Timber Co., Inc., Pope Resources LP, Deltic Timber Corp., and Potlatch Corp.  Both Deltic and Potlatch

have substantial operations other than owning timberland and selling timber.

In our view, neither expert appropriately considered that the other companies have assets other than timberland assets and that they earn income from sources other than timber sales. Because of this failure, and because other methods are available, we accord no weight to the "guideline publicly traded company" method used by Reilly or the similar method used by Thomson.

6.   The Accuracy-Related Penalty Under Section 6662

If there is an underpayment of tax, the penalty imposed is equal to 20 percent of the portion of the underpayment that is attributable to a "substantial estate * * * tax valuation understatement." Secs. 6662(a), (b)(5), 6664(a). For estate-tax returns filed before August 17, 2006, like the return in this case, there is a substantial estate-tax valuation understatement if the value of property shown on the estate-tax return is 50 percent or less of the correct value. Sec. 6662(g)(1) (effective for tax returns filed before the August 17, 2006, amendment by the Pension Protection Act of 2006, Pub. L. 109-280, sec. 1219(a)(1)(B), 120 Stat. 1083). On its estate-tax return, the estate claimed that the value of the 41.128-percent limited partner interest was $12,678,117. This is less than 50 percent of the correct value of $27,454,115. Therefore there was a substantial estate-tax valuation understatement.

However, no penalty is imposed with respect to an underpayment if there was reasonable cause for the underpayment and the taxpayer acted in good faith. Sec. 6664(c)(1). Whether an underpayment of tax is made in good faith and due to reasonable cause will depend upon the facts and circumstances of each case. Sec. 1.6664-4(b)(1), Income Tax Regs. In determining whether a taxpayer acted reasonably and in good faith with regard to the valuation of property, factors to be considered include: (1) the methodology and assumptions underlying the appraisal; (2) the appraised value; (3) the circumstances under which the appraisal was obtained; and (4) the appraiser's relationship to the taxpayer. Id. Although the IRS bears the burden of production under section 7491(c) that the section 6662 penalty is appropriate, the taxpayer bears the burden of proof in demonstrating reasonable cause. See Higbee v. Commissioner, 116 T.C. 438, 446-448 (2001).

The executor of the estate is the decedent's son, Larry Giustina. Larry Giustina hired a lawyer, Steven Lane, to prepare the estate-tax return. Lane hired Columbia Financial Advisors to appraise the 41.128-percent limited partner interest. Larry Giustina relied on the Columbia appraisal in filing the return.

The Columbia appraisal, like the Reilly report, valued the limited partner interest on the basis of capitalized cashflows, capitalized distributions, and the market values of other companies. Even though the Columbia appraisal did not incorporate the asset method, it was reasonable for the executor to rely on the Columbia appraisal. The partnership had been in operation for 15 years. It was reasonable to conclude that the partnership would continue to maintain its timberland assets without liquidating them.

The underpayment of tax on the estate's tax return resulted from its valuation of the 41.128-percent limited partner interest. The valuation was made in good faith and with reasonable cause. The estate is not liable for the section 6662 penalty.

To reflect the foregoing,

Decision will be entered under Rule 155.