T.C. Memo. 2016-114

UNITED STATES TAX COURT

ESTATE OF NATALE B. GIUSTINA, DECEASED,
LARAWAY MICHAEL GIUSTINA, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 10983-09.                    Filed June 13, 2016.

<u>D. John Thornton</u> and <u>Kevin C. Belew</u>, for petitioner.

<u>Kelley A. Blaine</u>, for respondent.

SUPPLEMENTAL MEMORANDUM OPINION

MORRISON, <u>Judge</u>:  This case is before us on remand from the U.S. Court

of Appeals for the Ninth Circuit (hereafter "Ninth Circuit") in <u>Estate of Giustina v.</u>

---

[*]This opinion supplements <u>Estate of Giustina v. Commissioner</u>, T.C. Memo. 2011-141, <u>rev'd and remanded</u>, 586 F. App'x 417 (9th Cir. 2014).

[*2] <u>Commissioner</u>, 586 F. App'x 417 (9th Cir. 2014), <u>rev'g and remanding</u> T.C. Memo. 2011-141. In our first opinion we held that the value of a 41.128% limited-partner interest was $27,454,115.[1] The Ninth Circuit held that our valuation was flawed because we should not have considered the value of the assets owned by the partnership. It remanded the case for us to recalculate the value using the partnership's value as a going concern. The Ninth Circuit also held that we erred by failing to adequately explain our reason for reducing the partnership-specific risk premium from 3.5% to 1.75%. To implement the remand from the Ninth Circuit, we perform a series of tasks in this supplemental opinion:

- We adjust our valuation of the 41% limited-partner interest to give no weight to the value of the assets owned by the partnership. <u>See</u> <u>Discussion</u> part 1, <u>infra</u>.

- We further explain our original reason for reducing the partnership-specific risk premium from 3.5% to 1.75%. <u>See</u> <u>Discussion</u> part 2.a, <u>infra</u>.

- We hold that our original reason is not valid because it is inconsistent with the Ninth Circuit's opinion. <u>See</u> <u>Discussion</u> part 2.b, <u>infra</u>. We adjust our valuation of the 41% limited-partner interest to incorporate a partnership-specific risk premium of 3.5%.

- We recalculate our valuation of the 41% limited-partner interest as $13,954,730. <u>See</u> <u>Discussion</u> part 3, <u>infra</u>. This is the result of: (1) giving

---

[1]The interest we valued was a 41.128% limited-partner interest in Giustina Land & Timber Co. Limited Partnership owned by Natale Giustina through a revocable trust at his death. For simplicity, we refer to this interest as a 41% limited-partner interest.

**[*3]** no weight to the value of the assets owned by the partnership and (2) using a partnership-specific risk premium of 3.5%.

## Background

Facts

When he died in 2005, Natale Giustina owned a 41% limited-partner interest in a partnership named Giustina Land & Timber Co. Limited Partnership. The partnership owned 47,939 acres of timberland and had 12 to 15 employees. It earned profits from growing trees, cutting them down, and selling the logs. It had continuously operated this business since its formation in 1990.

It was agreed for the purpose of this litigation that, if the partnership were to sell off its timberlands, it would receive almost $143 million. If one adds in the value of the nontimberland assets, the partnership would receive $150,680,000 if it were to sell all of its assets.

Through corporate structures, the partnership had two general partners: Larry Giustina[2] and James Giustina. The partnership had eight limited partners:

(1) the revocable trust of Natale Giustina,

(2) Sylvia Giustina (daughter of Anselmo Giustina, Natale Giustina's brother),

---

[2]Larry Giustina's full name is Laraway Michael Giustina.

[*4]   (3) James Giustina (son of Anselmo Giustina),

(4) Natalie Giustina Newlove (daughter of Natale Giustina),

(5) Irene Giustina Goldbeck (daughter of Natale Giustina),

(6) Dolores Giustina Fruiht (another relative),

(7) Larry Giustina (son of Natale Giustina), and

(8) the Anselmo Giustina Family Trust.

The limited partners were members of the same family (or trusts for the benefit of members of the family). Section 9.3 of the partnership agreement provided that a limited-partner interest could be transferred only to another limited partner (or to a trust for the benefit of another limited partner) unless the transfer was approved by the general partners. A dissolution provision in the partnership agreement, section 12.2, provided that if two-thirds of the limited partners agreed (as measured by percentage interest), then the partnership would be dissolved, its assets sold, and the proceeds distributed to the partners.

Our first opinion

In 2010 this case was tried. In 2011 we filed our first opinion. There we declined to adopt entirely the findings of either the estate's expert or the IRS's expert with respect to the value of the 41% limited-partner interest.

**[\*5]**    The IRS's expert gave a 60% weight to the value of the partnership's assets. We took the view that these asset values were relevant to the value of the 41% limited-partner interest only to the extent of the probability that the partnership would sell its assets.[3]  The value of the 41% limited-partner interest is the price that would be agreed to by a hypothetical seller and buyer.  Sec. 20.2031-1(b), Estate Tax Regs.  We determined that there was only a 25% chance that the partnership would sell its assets after Natale Giustina's limited-partner interest was transferred to a hypothetical third party.  We reasoned that there was a 25% chance that the hypothetical buyer of the 41% limited-partner interest could convince two-thirds of the partners to either:  (1) vote to dissolve the partnership, resulting in the sale of the partnership's assets and distribution of the proceeds to the partners or (2) replace the two general partners (who have the authority to sell the assets and make distributions) to achieve the same result.  We therefore gave a 25% weight to the value of the partnership assets rather than the 60% weight used by the IRS's expert.

The estate's expert gave a 30% weight to the cashflows that would be received by the partnership if it were to continue its operations.  We took the view

---

[3]Our first opinion stated:  "In our view, * * * the asset method is appropriate to reflect the value of the partnership if its assets are sold."  Estate of Giustina v. Commissioner, slip op. at 19-20.

[*6] that the cashflows were relevant to the value of the 41% limited-partner interest only to the extent of the probability that the partnership would continue its operations.[4]  We determined there was a 75% chance that the partnership would continue its operations.  Therefore we used a weight of 75%, rather than the 30% used by the estate's expert.

In order to incorporate the cashflows from continued operations into our valuation, we had to determine the present value of the cashflows.  We did this by adjusting the calculations that the estate's expert had made of the present value of the cashflows.  The estate's expert assumed that the partnership's cashflows would increase 4% each year.  We agreed with this assumption.  The estate's expert also assumed that the discount rate for discounting the cashflows to present value should be 18%.  This 18% rate is the sum of:  (1) 4.5% risk-free rate of return equal to the rate of return on Treasury bonds, (2) 3.6% risk premium for timber-industry companies, (3) 6.4% risk premium for small companies, and (4) 3.5% risk premium for the unique risk of the partnership.  We accepted all of these components of the estate expert's discount rate with the exception of the 3.5% risk premium for the unique risk of the partnership.  We concluded that this risk

---

[4]Our first opinion stated:  "In our view, the cashflow method is appropriate to reflect the value of the partnership if it is operated as a timber company".  Estate of Giustina v. Commissioner, slip op. at 19-20.

**[\*7]** premium should be only 1.75% (half the premium assigned by the estate's expert) because an investor could partially eliminate the risk by owning a diversified portfolio of assets.

The Ninth Circuit opinion

In 2012 we entered a decision consistent with the first opinion, and the estate appealed. The Ninth Circuit issued an unpublished opinion reversing the decision and remanding the case. The Ninth Circuit held that we had clearly erred by finding that there was a 25% chance that the partnership would dissolve. The Ninth Circuit held that a buyer who intended to dissolve the partnership would not be allowed to become a limited partner by the general partners, who favored the continued operation of the partnership. And the Ninth Circuit found it implausible that the buyer would seek the removal of the general partners who had just granted the buyer admission to the partnership. Finally, the Ninth Circuit found it implausible that enough of the other partners would go along with a plan to dissolve the partnership. Consequently, the Ninth Circuit directed us on remand to "recalculate the value of the Estate based on the partnership's value as a going concern." Estate of Giustina v. Commissioner, 586 F. App'x at 418.

The Ninth Circuit also held that the Tax Court "clearly erred by failing to adequately explain its basis for cutting in half the Estate's expert's proffered

[*8] company-specific risk premium." Id. The Ninth Circuit found our explanation that an investor could diversify assets insufficient "without considering the wealth a potential buyer would need in order to adequately mitigate risk through diversification." Id. at 419.

The Ninth Circuit's opinion ended with the words "REVERSED and REMANDED for recalculation of valuation." Id.

## Discussion

1.  Adjusting the respective weights assigned to the cashflow method and the asset method

The Ninth Circuit has directed us to revise our valuation of the 41% limited-partner interest. The first revision we make is to change the weight we accorded the value of the partnership's assets. In our first opinion, we assigned a 25% weight to this value and a 75% weight to the present value of the cashflows from the continued operation of the partnership. The Ninth Circuit has instructed us to "recalculate the value of the Estate based on the partnership's value as a going concern." In our view, the going-concern value is the present value of the cashflows the partnership would receive if it were to continue its operations. Therefore, we implement the Ninth Circuit's instruction by changing the weight we accord the present value of cashflows from 75% to 100%. This causes our

[*9] adjusted valuation of the 41% limited-partner interest to be entirely based on the partnership's value as a "going concern".

2. The partnership-specific risk premium

    a. <u>Our rationale for reducing the partnership-specific risk premium was that a potential buyer could be a multiowner entity whose owners could diversify the partnership-specific risk of owning the 41% limited-partner interest</u>.

With respect to the partnership-specific risk premium, our first task in implementing the remand is to further explain our reason for making a 50% reduction in the premium assigned by the estate's expert. The Ninth Circuit held that we erred by failing to consider whether a prospective buyer would need to be wealthy enough to diversify the partnership-specific risk.

We address this error on remand by providing a further explanation of our reasoning. In our first opinion, we believed that the hypothetical buyer, <u>see</u> sec. 20.2031-1(b), Estate Tax Regs., would be able to diversify some of the partnership-specific risk associated with owning the 41% limited-partner interest.[5]

---

[5]Our first opinion said:

    The fourth component of Reilly's [the estate's expert's] 18-percent discount rate was a partnership-specific risk premium of 3.5 percent. Reilly explained that this risk premium was justified because the partnership's timberlands were not geographically dispersed. All were in Oregon. He also explained that the partnership's operations

(continued...)

[*10] Risk is not preferred by investors.  Richard A. Brealey, Stewart C. Myers, &

Franklin Allen, Principles of Corporate Finance 182 (8th ed. 2006) ("Most

investors dislike uncertainty".).  They require a premium to bear it.  However,

some of the risk associated with an asset (the "unique risk") can be eliminated

through diversification (1) if the owner of the asset also owns other assets, (2) if

the risks of the other assets are not associated with the asset in question, and (3) if

the other assets are great enough in value.[6]

---

[5](...continued)
were nondiversified.  The partnership's sole source of revenue was
timber harvesting.  Thus, it is apparent that a portion of the 3.5-
percent premium reflects the unique risks of the partnership.  But
unique risk does not justify a higher rate of return.  Investors can
eliminate such risks by holding a diversified portfolio of assets.  We
conclude that the partnership-specific risk premium should be only
1.75 percent.

Estate of Giustina v. Commissioner, slip op. at 16-17 (fn. ref. omitted).

[6]A footnote in our first opinion stated:

Richard A. Brealey and Stewart C. Myers explain:

The risk that potentially can be eliminated by diversification is called
unique risk.  Unique risk stems from the fact that many of the perils
that surround an individual company are peculiar to that company and
perhaps its immediate competitors.  But there is also some risk that
you can't avoid, regardless of how much you diversify.  This risk is
generally known as market risk.  Market risk stems from the fact that
there are other economywide perils that threaten all businesses.

(continued...)

[*11] In evaluating the potential buyer's ability to diversify the risks associated with the partnership, we assumed that the buyer could be an entity owned by multiple owners. Examples of such an entity include a publicly-traded timber company, a real-estate investment trust, or a hedge fund. The unique risk associated with the 41% limited-partner interest would have been diversified because the entity's owners--wealthy or not--could hold other assets outside the entity.[7] For example, suppose that a publicly-traded timber company were the buyer of the 41% limited-partner interest. Suppose that a shareholder of the company owns $1,000 in stock in the company and $15,000 of other assets

---

[6](...continued)

Brealy [sic] & Myers, Principles of Corporate Finance 168 (7th ed. 2003) (fn. refs. omitted); see also Booth, "The Uncertain Case for Regulating Program Trading", 1994 Colum. Bus. L. Rev. 1, 28 ("Because diversification can eliminate the unique risks associated with investing in individual companies, the market pays no additional return to those who assume such risks.").

Estate of Giustina v. Commissioner, slip op. at 17 n.5.

[7]Alternatively, one could think that the entity, not its owners, could diversify the risks of holding the 41% limited-partner interest. For example, suppose that the hypothetical buyer is a publicly-traded timber company. Such a company could purchase the 41% limited-partner interest while holding other substantial assets. These other assets could have returns that are unaffected by the partnership-specific risk. Thus, these other assets could provide diversification of the partnership-specific risk.

[*12] unrelated to timber. The shareholder would be unconcerned by the individual risk associated with the purchase of the 41% limited-partner interest by the publicly-traded timber company in which he or she had a $1,000 stake. That risk would be diversified by the shareholder's $15,000 stake in other assets.

On the basis of our assumption that an entity with multiple owners could be the hypothetical buyer of the 41% limited-partner interest, we believed that a hypothetical buyer would not require a premium for all the partnership-specific risk associated with owning the interest.[8] We also clarify that the <u>only</u> reason we believed that the 3.5% premium should be halved was that it did not account for the possibility that the hypothetical buyer of the 41% limited-partner interest could diversify the risk.

    b.    <u>The assumption in our first opinion that the hypothetical buyer of the 41% limited-partner interest could diversify the partnership-specific risk of the 41% limited-partner interest should no longer be made.</u>

The text in part 2.a above is a more extensive explanation for our halving the 3.5% partnership-specific risk premium. It includes an explanation of how the

---

[8]The estate's expert opined that a 3.5% premium was appropriate for the partnership-specific risk of owning the 41% limited-partner interest. <u>Estate of Giustina</u>, slip op. at 16. The theory of asset diversification might suggest that the entire 3.5% premium should be eliminated. The reason we did not completely eliminate the 3.5% premium is that we believed that in practice (as opposed to theory) a buyer might still be averse to the partnership-specific risk.

[*13] potential buyer could diversify the partnership-specific risk. This explanation partially resolves our duty to implement the remand of the Ninth Circuit. But we have more work to do. We should also consider whether our reasoning is still valid after the Court of Appeals opinion.

The Court of Appeals opinion, in discussing the possibility that a hypothetical buyer could force the sale of the partnership's assets, held that the hypothetical buyer must be a buyer to whom a transfer of a limited-partner interest is permitted under section 9.3 of the partnership agreement. By the same token, in evaluating the hypothetical buyer's ability to diversify risk, we should consider only a buyer whose ownership of a limited-partner interest is permitted by section 9.3 of the partnership agreement.

Under section 9.3 of the partnership agreement, a limited-partner interest can be transferred only to another limited partner (or a trust for the benefit of another limited partner) or a person receiving the approval of the two general partners. Other than Natale Giustina, there were seven limited partners. All seven are individuals and trusts. None is an entity with multiple owners such as a publicly-traded corporation, a real-estate investment trust, or a hedge fund. The record does not support the notion that any of the limited partners (or any trust for the benefit of the limited partners) has enough assets to diversify the risks of

[*14] owning an additional 41% limited-partner interest.  The limited partners appear to be family members (or trusts for the benefit of family members) who probably have most of their wealth tied up in the family timberland business in the form of their partner interests in the partnership.

Under section 9.3 of the partnership agreement, a limited-partner interest can be transferred to a person other than a limited partner (or trust for the benefit of a limited partner) only if that person is approved by the two general partners. The two general partners are Larry Giustina and James Giustina (through corporate structures).  For 25 years, Larry Giustina and James Giustina had run the partnership as an operating business.  The record suggests that these two men would refuse to permit someone who is not interested in having the partnership continue its business to become a limited partner.  Thus, we believe that they would not permit a multiple-owner investment entity to become a limited partner. Such an entity seeks to increase the returns on its investments.  Brealey, Myers, & Allen, supra, at 182 ("Most investors like high expected returns".).  If such an entity owned the 41% limited-partner interest, it would attempt to have the partnership discontinue its operations and dissolve.  (At dissolution it would get 41% of the value of the partnership's assets, or 41% of $150.68 million.  In contrast to the $150.68 million that would be received by all the partners from

**[*15]** dissolving the partnership, the value of the cashflows from the partnership's continued operations would be only $33.8 million (according to the estate's expert), $51.7 million (according to our first opinion), or $65.76 million (according to the IRS's expert). These values are 22%, 34%, and 44%, respectively, of the $150.68 million that would be realized by dissolving the partnership.) More generally we find that no buyer that Larry Giustina and James Giustina would permit to become a limited partner would be able to diversify the partnership-specific risk.

As a result of our finding above, we determine that a hypothetical buyer of the 41% limited-partner interest would be unable to diversify the individual risks associated with the partnership. Without diversification, the buyer would demand the full 3.5% risk premium assigned to the interest by the estate's expert. In our first opinion, we determined that the discount rate should be 16.25%, which corresponds to a direct capitalization rate of 12.25%. We now determine that the discount rate should be 18%, which corresponds to a direct capitalization rate of 14%.

In our first opinion we determined that the present value of the partnership's cashflows was $51,702,857. Increasing the discount rate from 16.25% to 18%

**[\*16]** causes this value to decrease to $45,240,000.  The mechanics of this recalculation are illustrated by the table below:

| Valuation of all partnership interests on a marketable basis using the cashflow method | | | |
|---|---|---|---|
| | Estate's expert's calculations in exhibit 10 of his report | As adjusted by Tax Court (first opinion) | As adjusted by Tax Court (on remand) |
| Normalized pretax income | $6,120,000 | $6,120,000 | $6,120,000 |
| Normalized net income (normalized pretax income reduced 25% by estate's expert for income tax) | 4,590,000 | 6,120,000 | 6,120,000 |
| Total adjustments to estimated cashflows | −30,000 | −30,000 | −30,000 |
| Normalized net cashflows | 4,560,000 | 6,090,000 | 6,090,000 |
| Projected normalized net cashflows (normalized net cashflows increased by long-term growth rate of 4%) | 4,743,000 | 6,333,600 | 6,333,600 |
| Direct capitalization rate | 14% | 12.25% | 14% |
| Total equity value on a marketable, noncontrolling ownership interest basis (estate's expert's estimate is rounded) | 33,800,000 | 51,702,857 | 45,240,000 |

3.    Conclusion

In our first opinion we valued the 41% limited-partner interest at $27,454,115.  After making the two changes discussed in this supplemental opinion (eliminating any weight attributed to the value of the partnership's assets and applying the 3.5% partnership-specific risk premium), our valuation changes to $13,954,730.  This change is explained in the table below:

| [*17] Valuation of the 41.128% limited-partner interest: comparison of approaches | | | | |
|---|---|---|---|---|
| Methods and adjustments | Reilly (estate's expert) | Thomson (IRS's expert) | Tax Court (first opinion) | Tax Court (opinion on remand) |
| Asset-accumulation method | 10% × $51,100,000 | --- | --- | --- |
| Cashflow method | 30% × $33,800,000 | 20% × $65,760,000 | 75% × $51,702,857 | 100% × $45,240,000 |
| Capitalization-of-distributions method | 30% × $52,100,000 | --- | --- | --- |
| Price-of-shares-of-other-companies method | 30% × $59,100,000 | 20% × $99,550,000 | --- | --- |
| Asset method | --- | 60% × $150,680,000 | 25% × $150,680,000 | 0% × $150,680,000 |
| Total | $48,610,000 | $123,470,000 | $76,447,143 | $45,240,000 |
| Discount for lack of marketability | 35% | 25% | 25% (applied to value from cash-flow method only, for a weighted discount of $9,694,286) | 25% (or $11,310,000) |
| Discount for lack of control | 0% | 12% | 0% | 0% |
| Total after discounts | $31,597,000 | $81,490,200 | $66,752,857 | $33,930,000 |
| × 41.128% | $12,995,000 | $33,515,000 | $27,454,115 | $13,954,730 |

[*18] The change in valuation of the 41% limited-partner interest will affect the deficiency. The parties will be ordered to provide their recomputation of the deficiency under Tax Court Rule of Practice and Procedure 155.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.