T.C. Memo. 2020-28

UNITED STATES TAX COURT

PIERSON M. GRIEVE, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8249-18.                    Filed March 2, 2020.

<u>William D. Thomson</u> and <u>James G. Bullard</u>, for petitioner.

<u>Randall L. Eager, Jr.</u>, and <u>Christina L. Cook</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined a deficiency in petitioner's

2013 Federal gift tax of $4,399,032 and an accuracy-related penalty pursuant to

section 6662(a) and (b)(5) of $628,199 for a substantial gift tax valuation

**[\*2]** understatement. After concessions,[1] the remaining issues for consideration are the fair market values of petitioner's 99.8% member interest in Rabbit 1, LLC (Rabbit), transferred to the Pierson M. Grieve 2013 Grantor Retained Annuity Trust (GRAT) on October 9, 2013,[2] and his 99.8% member interest in Angus MacDonald, LLC (Angus), transferred to the Grieve 2012 Family Irrevocable Trust (Irrevocable Trust) on November 1, 2013.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts is incorporated in our findings by this reference. Petitioner resided in Florida when he timely filed his petition.

---

[1]Respondent conceded that petitioner is not liable for the accuracy-related penalty pursuant to sec. 6662(a), (b)(5), and (g). Petitioner conceded that he underestimated his total taxable gifts from prior periods by $188,991.

[2]The parties stipulated that petitioner will not owe additional gift tax if we determine that he understated the initial fair market value of assets transferred to the GRAT if, within a reasonable time, the GRAT pays to petitioner, or to his personal representative in the event of his passing, an amount equal to the difference of the properly payable annuity and the annuity actually paid.

[*3] I.  Petitioner's Background

Petitioner was married to Florence Grieve, and they had three children. Florence died suddenly on October 1, 2012. Margaret Grieve was their eldest child, and she practiced law in the financial services industry and served as chair of the board of the Central Asia American Enterprise Fund.

At the end of petitioner's career he was the chairman and chief executive officer of Ecolab, Inc. (Ecolab), from 1983 to 1996. Ecolab is a public corporation listed on the New York Stock Exchange and headquartered in St. Paul, Minnesota. Throughout his career petitioner accumulated wealth. While at Ecolab he acquired the corporation's stock that he and his family continued to own.

In the late 1980s or early 1990s petitioner established the Grieve Family Limited Partnership. Pierson M. Grieve Management Corp. (PMG) was the general partner of the Grieve Family Limited Partnership. Petitioner consolidated management of his assets in PMG. These entities were created to preserve and manage petitioner's family wealth.

In the early 2000s Margaret became involved in helping petitioner manage the family wealth. In 2008 she purchased PMG from petitioner for $6,200 and became its president. Since 2008 Margaret has owned all of the outstanding

[*4] shares of PMG. Additionally, she has managed the Grieve family office through PMG and has not been compensated.

Petitioner and Florence had engaged a law firm to handle their business and estate planning needs. In 2012 they decided to update their estate plan. Petitioner requested that the law firm perform a top-to-bottom analysis of his assets to address how best to achieve the family's wealth-management goals in a tax-efficient manner. Florence died before the updated estate plan was finalized. As part of their updated estate plan petitioner and Florence asked Margaret to assume full-time responsibility for managing the family wealth. Since 2012 Margaret has been responsible for investing and managing the family wealth.

PMG held a controlling ownership interest in closely held entities with approximately $70 million in assets. The portfolio of assets was held in an investment account at Goldman Sachs. Margaret selected the wealth management group at Goldman Sachs as PMG's investment adviser and asset manager.

Although the family's Ecolab stock was held in custody accounts at Goldman Sachs' San Francisco office, Margaret made the investment decisions pertaining to the Ecolab stock. Goldman Sachs neither managed nor charged a management fee on the Ecolab stock held in its custody accounts. Margaret

[*5] decided to maintain a concentrated position in the Ecolab stock because of its low cost basis.

Margaret worked with the law firm to develop petitioner's updated estate plan. In order to accomplish petitioner's goal, two entities were created: Rabbit and Angus.

## II. Rabbit

Rabbit was formed as a limited liability company (LLC) under the laws of Delaware on July 31, 2013. At its inception Rabbit had two members: PMG and the Pierson M. Grieve Revocable Trust (Grieve Revocable Trust). On August 28, 2013, PMG contributed $2 and the Grieve Revocable Trust contributed $998 to a brokerage account in Rabbit's name. The following chart reflects member contributions and the ownership structure of Rabbit as of July 31, 2013:

| Member | Initial contribution | Class A voting units | Class B nonvoting units | Ownership interest |
|---|---|---|---|---|
| PMG | $2 | 20 | -0- | 0.2% |
| Grieve Revocable Trust | 998 | -0- | 9,980 | 99.8% |

On September 3, 2013, petitioner transferred to Rabbit's brokerage account 82,984 Ecolab shares with a fair market value of $7,682,659. Petitioner deposited $1 million in cash into Rabbit's brokerage account on September 18, 2013. As of

**[\*6]** October 9, 2013, Rabbit had no debt and its brokerage account had a fair market value of $9,102,757.[3]

On October 6, 2013, petitioner and Margaret, in her capacity as trustee of the Grieve Revocable Trust, executed the GRAT agreement. Petitioner structured the GRAT according to Internal Revenue Service guidance to avoid incurring gift tax liability.[4] The GRAT agreement provided that the trustee shall pay to petitioner an annuity equal to the fair market value of assets transferred to the trust for Federal gift tax purposes as follows: (1) 47.14757% to be paid within 105 days of October 9, 2014, and (2) 56.57708% to be paid within 105 days of October 9, 2015.

On October 9, 2013, Margaret, as trustee of the Grieve Revocable Trust, assigned 9,980 class B nonvoting units of Rabbit to the GRAT. Petitioner determined that the fair market value of the 9,980 class B units of Rabbit was $5,903,769 as of October 9, 2013, resulting in annuity payments pursuant to terms of the GRAT of $2,783,485 and $3,340,180.

---

[3]The parties stipulated that the fair market value as of October 9, 2013, was $9,067,074.

[4]Generally, under sec. 2702 and its corresponding regulations, where property is transferred in trust with the donor retaining an interest in the property, the value of the gift is the value of the property transferred, less the value of the donor's retained interest. See also sec. 25.2702-1, Gift Tax Regs.

[*7] III.    Angus

Angus was formed as an LLC under the laws of Delaware on August 13, 2012.[5] At its inception Angus had two members: PMG and Florence. On September 7, 2012, PMG contributed $200 and Florence contributed $99,800 to a brokerage account in Angus' name. Florence transferred her interest in Angus to petitioner on September 26, 2012. The following table reflects member contributions and the ownership structure of Angus as of September 7, 2012:

| Member | Initial contribution | Class A voting units | Class B nonvoting units | Ownership interest |
|--------|---------|---------|---------|---------|
| PMG | $200 | 20 | -0- | 0.2% |
| F. Grieve | 99,800 | -0- | 9,980 | 99.8% |

As of November 1, 2013, Angus had no debt and its brokerage account held the following assets with the following fair market values:

---

[5]Angus was originally formed as "Grieve 1, LLC", and changed its name to Angus on September 6, 2012.

[*8]

| Assets | Fair market value |
|---|---|
| Cash and short-term investments (brokerage account) | $20,665,824 |
| Limited partnership interests (Palladium Investments) | 7,316,882 |
| Investments in venture capital funds (Grossman Investments) | 406,406 |
| Promissory notes | 3,581,571 |
| Total | 31,970,683 |

On November 1, 2013, petitioner and South Dakota Trust Co., LLC, as trustee of the Irrevocable Trust, executed a single-life private annuity agreement. Petitioner created the Irrevocable Trust in 2012 for the benefit of the Grieve children. Under the terms of the single-life private annuity agreement petitioner assigned his 9,980 class B units in Angus to the Irrevocable Trust in exchange for a single-life annuity that paid an annual sum of $1,420,000. On November 1, 2013, the single-life private annuity had a fair market value of $8,043,675. Through this transaction petitioner intended to make a net taxable gift to the Irrevocable Trust to the extent that the fair market value of his interest in Angus exceeded the fair market value of the single-life private annuity.

IV. Operations of Rabbit and Angus

PMG owned the class A voting units, a 0.2% ownership interest, in both Rabbit and Angus. These entities were managed similarly. Margaret was the sole

[*9] owner of PMG and was chief manager of both Rabbit and Angus.  The LLC agreements of both Rabbit and Angus gave her a lifetime appointment as chief manager.  The agreements allowed her to be removed for cause and also provided her with the right to designate a successor chief manager.

Pursuant to the agreements the chief manager was entitled to reasonable compensation; however, Margaret chose not to receive compensation.  Members had the right to approve compensation, but if the chief manager was a member or an affiliate of a member, he or she could not participate in the compensation approval process.  The agreements defined "member" as the holder or holders of the issued and outstanding membership units which were divided into class A voting membership units and class B nonvoting membership units.  They defined "affiliate" to include a person who controls or is controlled by a member.

Holders of class A units possessed all of the voting powers for all purposes, whereas holders of class B units had no voting power.  Class B units could not vote on or participate in any proceedings in which the entity or its members took action.

The LLC agreements contained provisions about transferring membership units to a person other than the initial members.  They required the full consent of all members owning class A units before a member could transfer all or part of

[*10] their units, unless the person to whom the units were being transferred was a "permitted transferee". "Permitted transferee" was defined to include any lineal descendant of petitioner or Florence, a trust created for the exclusive benefit of any one or more such lineal descendants and/or their spouses, and, in the case of Rabbit, a charitable organization.

Neither the Rabbit nor the Angus class B units have been sold since their assignment to the GRAT and the Irrevocable Trust, respectively. They have never been offered for sale.

V.     Gift Tax Return and Notice of Deficiency

Petitioner timely filed his 2013 Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, along with valuation appraisal reports prepared by Value Consulting Group (VCG). Under the GRAT agreement petitioner's annuity payments equaled the fair market value of assets transferred to the GRAT plus the required statutory interest. On Schedule A, Computation of Taxable Gifts, he reported a total taxable gift of zero from the transfer of the 9,980 Rabbit class B units to the GRAT. For the transfer of the 9,980 class B units of Angus to the Irrevocable Trust, he reported a total taxable gift of $9,966,659 on Schedule A. Petitioner computed the net taxable gift resulting from the single-life private annuity using the values VCG estimated for the Angus class B units.

**[\*11]** VCG's appraisal reports provided the following valuations of each entity:

| Valuation of Rabbit | Fair market value |
|---|---|
| Value estimate of 100% controlling interest (as of October 9, 2013) | $9,102,757.00 |
| Divided by:  Total units outstanding | 10,000 |
| Value per unit (controlling ownership basis) | $910.28 |
| Less:  Lack of control discount (13.4%) | ($121.53) |
| Value per unit (marketable, minority ownership basis) | $788.75 |
| Less:  Lack of marketability discount (25%) | ($197.19) |
| Nonmarketable, minority fair market value per class B nonvoting membership unit | $591.56 |
| Value of 9,980 class B nonvoting units | $5,903,768.80 |

| Valuation of Angus | Fair market value |
|---|---|
| Value estimate of 100% controlling interest (as of November 1, 2013) | $31,970,683.00 |
| Divided by:  Total units outstanding | 10,000 |
| Value per unit (controlling ownership basis) | $3,197.07 |
| Less:  Lack of control discount (12.7%) | ($406.03) |
| Value per unit (marketable, minority ownership basis) | $2,791.04 |
| Less:  Lack of marketability discount (25%) | ($697.76) |
| Nonmarketable, minority fair market value per class B nonvoting membership unit | $2,093.28 |
| Value of 9,980 class B nonvoting units | $20,890,934.40 |

**[*12]** VCG used the adjusted net-asset method under the cost approach to determine the values of Rabbit and of Angus as of their respective appraisal valuation dates. Since the submission of petitioner's tax return, the parties have stipulated that the fair market value of assets held in Rabbit as of October 9, 2013, is $9,067,074. To determine the nonmarketable, minority fair market value per class B unit for each of Rabbit and Angus, VCG concluded that it was necessary to consider discounts for lack of control and lack of marketability.

To determine the lack of control discount for Rabbit the VCG report looked at a study that compiles control-premium data and minority stock interests held in publicly owned closed-end mutual funds investing in publicly traded securities. Because of Rabbit's small size and lack of diversification, VCG's report selected a lack of control discount of 13.4%, which was at the high end of the range of discounts indicated for closed-end mutual fund data that VCG considered.

To determine the lack of control discount for Angus the VCG report looked at a study that compiles control-premium data and closed-end mutual funds. The report concluded that the lack of control discount was 12.7%.

To determine the lack of marketability discount for Rabbit the VCG report looked at various studies that addressed the appropriate discounts for lack of marketability of closely held equity interests, including restricted stock studies.

**[\*13]** VCG's report concluded that the lack of marketability discount for Rabbit was 25%. The report used a similar method for Angus and concluded that the lack of marketability discount was 25%.

On January 29, 2018, respondent issued a notice of deficiency determining that petitioner had understated the fair market value of the 9,980 class B units of Rabbit transferred to the GRAT and increasing the fair market value from $5,903,769 to $9,048,866. Respondent also determined that petitioner had understated the fair market value of the 9,980 class B units of Angus transferred to the Irrevocable Trust and increased the fair market value from $20,890,934 to $31,884,403. Respondent correspondingly increased the net value of the gift from $9,966,659 to $17,819,139.

OPINION

I. Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner if the taxpayer establishes that he or she complied with the requirements of section 7491(a)(2)(A)

**[*14]** and (B) to substantiate items, to maintain required records, and to cooperate fully with the Commissioner's reasonable requests.

Petitioner contends that he meets the requirements of section 7491(a) and thus the burden of proof shifts to respondent regarding the fair market value of his gifts. The determination of fair market value is a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The parties' experts offer contrasting conclusions of value of the transferred interests based on differing interpretations of the relevant facts. However, we are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). We resolve the valuation issue on the preponderance of the evidence in the record with the guidance of those expert opinions that we find most helpful. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

## II.    Evidentiary Issue

In accordance with the Court's standing pretrial order and Rule 143(g), respondent provided to petitioner and submitted to this Court Mark Mitchell's expert reports. In his reports Mr. Mitchell opines on what he considers to be the fair market values of the 9,980 class B units of both Rabbit and Angus.

[*15] During trial petitioner objected to Mr. Mitchell's expert reports' being admitted into evidence. The Court deferred ruling on his objection. The Mitchell reports were marked, and testimony of respondent's expert was heard.[6] Whether the reports and testimony will be received into evidence and considered in determining the valuations of Rabbit and Angus depends on the application of principles expressed in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), and rule 702 of the Federal Rules of Evidence.[7]

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

---

[6]With agreement of the parties we directed the expert witnesses to testify concurrently. The procedure was implemented in substantially the same way as in <u>Rovakat, LLC v. Commissioner</u>, T.C. Memo. 2011-225. The concurrent expert testimony was in addition to the Court's customary practices regarding expert witnesses consistent with Rule 143(g).

[7]Proceedings of this Court are conducted in accordance with the Federal Rules of Evidence. <u>See</u> sec. 7453.

**[*16]**      (d) the expert has reliably applied the principles and methods to the facts of the case.

In <u>Daubert</u>, 509 U.S. at 592-593, the Supreme Court stressed the trial court's role as a "gatekeeper" in excluding at the outset evidence that is unreliable or irrelevant.  The reliability and relevancy standards are embodied in rule 702 of the Federal Rules of Evidence, and they apply equally to expert testimony that is not "scientific".  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 148 (1999).

Mr. Mitchell was qualified, without objection from petitioner, as an expert in business valuation, including the valuation of noncontrolling membership interests in family investment holding companies.  Petitioner contends that the Mitchell reports are "irrelevant, speculative, and unreliable".  Petitioner further contends that the Mitchell reports' valuations are inconsistent with the applicable Treasury guidelines and that instead they applied a novel valuation approach.

Since there is no dispute about the qualifications of Mr. Mitchell, we focus on the relevancy and the reliability of his valuation approach.  Rule 702 of the Federal Rules of Evidence is viewed as a rule of admissibility rather than exclusion.  <u>Arcoren v. United States</u>, 929 F.2d 1235, 1239 (8th Cir. 1991).  When an expert's methodology, not qualifications, is in dispute, exclusion of the expert

**[\*17]** report is not warranted.  See <u>Synergetics, Inc. v. Hurst</u>, 477 F.3d 949, 956 (8th Cir. 2007).

The Mitchell reports set forth the facts and data relied upon, the methodology employed, and the manner in which the methodology was applied to the facts and data.  Petitioner had the opportunity during cross-examination to challenge Mr. Mitchell's assumptions.  <u>See</u> <u>id.</u> at 955-956.  Accordingly, the Mitchell reports are admitted into evidence.

III.   <u>Gift Tax Valuation Principles</u>

Section 2501(a) imposes a tax on the transfer of property by gift made during that taxable year by an individual.  The donor is primarily responsible for paying the gift tax.  Sec. 2502(c).  The amount of gift tax is based on the aggregate value of taxable gifts made during the year, among other things.  <u>See</u> sec. 2502(a) (imposing the gift tax on a cumulative basis).  Taxable gifts are the total amount of gifts made during the year, less certain deductions.  Sec. 2503(a).  The total amount of gifts in the year is the sum of the values of the gifts made in the year in excess of the exclusion amount in section 2503(b).  Sec. 25.2503-1, Gift Tax Regs.

The value of a gift of property is generally the value of the property on the date of the gift.  <u>See</u> sec. 2512(a).  The fair market value of the property is the price at which the property would change hands between a willing buyer and a

**[*18]** willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. See United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 25.2512-1, Gift Tax Regs. The willing buyer and seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual buyer or the actual seller. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Kahn v. Commissioner, 125 T.C. 227, 231 (2005); Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998).

The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage. Estate of Davis v. Commissioner, 110 T.C. at 535. Transactions that are unlikely and plainly contrary to the economic interests of a hypothetical willing buyer or a hypothetical willing seller are not reflective of fair market value. See Estate of Newhouse v. Commissioner, 94 T.C. at 232. In valuing an LLC interest the rights, restrictions, and limitations of the various classes of interests must be considered. Id. at 218.

**[\*19]** IV.    Experts' Valuations

Petitioner relies on the valuation determinations of Mr. Frazier, and respondent relies on the valuation determinations of Mr. Mitchell.  Both experts prepared reports containing their respective analyses and conclusions of the fair market values for the 9,980 class B units of both Rabbit and Angus.  We may adopt or reject an expert's opinion in whole or in part.  Estate of Davis v. Commissioner, 110 T.C. at 538; see also Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980).  Where experts offer divergent estimates of fair market value, we weigh each estimate by analyzing the factors which those experts used to arrive at their conclusions.  Estate of Davis v. Commissioner, 110 T.C. at 538; Casey v. Commissioner, 38 T.C. 357, 381 (1962).

Mr. Frazier used a combination of the market approach and the income approach.  He concluded that on October 9, 2013, the 9,980 class B units of Rabbit were worth $5,884,000 on a noncontrolling, nonmarketable basis, after adjustments and discounts.  He valued each unit at $589.58.  Mr. Frazier concluded that on November 1, 2013, the 9,980 class B units of Angus were worth $19,854,000 on a noncontrolling, nonmarketable basis, after adjustments and discounts.  He valued each unit at $1,989.39.

[*20] In his analysis Mr. Mitchell relied on the net asset value (NAV) of Rabbit that was stipulated by the parties and of Angus as determined by VCG.  He concluded that any willing seller of the class B units would look to acquire control of the 0.2% interest held by the class A unit holder to avoid the large discounts that a willing buyer would seek.  Mr. Mitchell calculated $130,000 and $450,000 as the reasonable premiums a hypothetical seller could pay PMG for its 0.2% interests in Rabbit and Angus, respectively.

Mr. Mitchell concluded that on October 9, 2013, the 9,980 class B units of Rabbit were worth $8,918,940 and each unit was worth $893.68.  He concluded that on November 1, 2013, the 9,980 class B units of Angus were worth $31,456,742 and each unit was worth $3,151.98.

A.    NAV

Mr. Frazier assessed independently the assets contributed to Rabbit and determined a combined NAV of $9,066,659 as of October 9, 2013.  The parties stipulated that the NAV was $9,067,074 as of October 9, 2013.[8]  As of the date of valuation Rabbit's assets included cash and cash equivalents and Ecolab stock.  Mr. Frazier looked at the average high and low price per share of Ecolab stock on October 9, 2013, to determine the fair market value as of the valuation date.

---

[8]This is amount is lower than the $9,102,757 reported on the VCG report.

[*21] Mr. Mitchell used the NAV stipulated by the parties. Mr. Frazier's valuation is $415 less than the value which the parties stipulated. We conclude that the NAV as of October 9, 2013, was $9,067,074. We do not see a reason to change the NAV from that which was stipulated by the parties.

Mr. Frazier assessed independently the assets contributed to Angus and determined a combined NAV of $30,930,099 as of November 1, 2013. VCG concluded that the NAV was $31,970,683 as of November 1, 2013, and that value was reported in VCG's appraisal report attached to petitioner's 2013 Form 709.

Mr. Frazier computed the values of Palladium Investments and Grossman Investments but did not reach the same results as VCG. Palladium Investments held investments in a portfolio of companies that were in transition and required a new financial or operational strategy. Grossman Investments held investments in venture capital funds. Mr. Frazier started with VCG's valuations of $7,316,882 for Palladium Investments and $406,406 for Grossman Investments. He then applied a minority interest discount of 15% and marketability discount of 20% which resulted in a valuation of $5,125,880 for Palladium Investments and $276,356 for Grossman Investments. Respondent opposes these adjustments and contends that the adjustments result in multiple tiers of discounts if the Frazier

**[\*22]** report's valuation of Angus is accepted since his valuation includes further discounts.

Mr. Mitchell used the same NAV determined by VCG in its appraisal report. Mr. Frazier's valuation is $1,040,584 less than the value petitioner reported on the schedules and attachments to his 2013 Form 709. We conclude that the NAV of Angus as of November 1, 2013, was $31,970,683. We find no justification to lower the NAV of Angus to a value that is significantly lower than the value to which petitioner previously admitted. See Estate of Hall v. Commissioner, 92 T.C. at 337-338 ("[T]he reported values are an admission by * * * [the taxpayer], so that lower values cannot be substituted without cogent proof that the reported values were erroneous.").

B.    Frazier Reports' Valuations

After Mr. Frazier determined the NAVs of Rabbit and Angus, he used the market approach and the income approach to determine the value of the class B units of both Rabbit and Angus.

1.    Valuation of Rabbit

Mr. Frazier used the market approach and looked at available data from empirical studies. In his report he analyzed closed-end funds to determine the lack of control discount and restricted stock studies to determine the lack of

[*23] marketability discount.  Then he performed a valuation using the income approach.  Each analysis reached a different conclusion, and the report weighted both equally to determine the fair market value.

### a.    Market Approach

Mr. Frazier selected and analyzed 33 closed-end funds from a database provided by Morningstar, Inc. (Morningstar).  According to Mr. Frazier, closed-end funds have sold historically at a discount because of the noncontrolling nature of an investment in a closed-end fund.  In his report Mr. Frazier explains that the lack of control over day-to-day operations and investment decisions, and the inability to liquidate assets of the entity are investment characteristics shared by investors in publicly traded closed-end funds.  He highlights differences between an investment in Rabbit and an investment in a closed-end fund.  For example, an investment in Rabbit is illiquid, and investors in a closed-end fund are protected by Securities and Exchange Commission regulations.

To determine the lack of control discount Mr. Frazier considered the day-to-day management of Rabbit and the ability of the owner of the class B units to influence liquidation of the company's assets.  He determined that the median and average discounts for lack of control of the 33 closed-end funds were 11.2%

[*24] and 10.8%, respectively. He also determined that the low-payout, domestic equity closed-end funds traded at a median discount of 15.5% for lack of control.

On the basis of his analysis of the 33 closed-end funds Mr. Frazier concluded that a 16.4% lack of control discount should apply to the portion of Rabbit's NAV consisting of marketable equity securities and a nominal 5% discount should apply to its NAV consisting of cash and short-term investments. He applied an overall weighted discount of 15.1% for lack of control.

Next, Mr. Frazier used restricted stock studies to determine a lack of marketability discount. Restricted stock studies compare publicly traded stock prices to the price of the same stock sold in private placement. In his analysis he took into consideration the terms of the LLC agreement and focused on the likelihood of dissolution, likelihood of distributions, ability to withdraw funds, and restrictions on transfers. His analysis considered factors that we outlined in Mandelbaum v. Commissioner, T.C. Memo. 1995-255, aff'd, 91 F.3d 124 (3d Cir. 1996), which he described as the holding period, the risk of the underlying assets, and the company's distribution policy. He concluded that Rabbit's lack of marketability discount was 25%. Using the market approach the Frazier report concluded that the fair market value of Rabbit's 9,980 class B units was $5,761,649.

**[*25]**                    b.      Income Approach

Mr. Frazier used the nonmarketable investment company evaluation (NICE) method which he developed as a valuation technique applicable to entities that hold a portfolio of investment assets.  The NICE method determines a price that an investor would pay for the subject interest that lacks control and marketability by taking into consideration the investment risks and expected returns.  In applying the NICE method, empirical studies were used to determine the incremental required rates of return in the light of information asymmetry (lack of control) and the cost of illiquidity (lack of marketability).  Using the NICE method Mr. Frazier determined that Rabbit's 9,980 class B units had a fair market value of $6,006,659.

                    c.      Fair Market Value Conclusion

In his report Mr. Frazier weighted equally the outcomes of the market and income approaches and concluded that the fair market value of Rabbit's 9,980 class B units was $5,884,000.  The analysis resulted in a total discount to Rabbit's NAV of approximately 34.97%.  His analysis is summarized in the following table:

[*26]

| Approach | Fair market value | Weight (percent) | Total |
|---|---|---|---|
| Market approach | $5,761,649 | 50 | $2,880,824.50 |
| Income approach | 6,006,659 | 50 | 3,003,329.50 |
| Fair market value | | | 5,884,154.00 |
| Rounded | | | 5,884,000.00 |
| Per-unit value | | | 589.58 |

2.     Valuation of Angus

Mr. Frazier used the same methodology for the valuation of Angus as he did for the valuation of Rabbit.

a.     Market Approach

In his report Mr. Frazier analyzed the maximum, minimum, and mean discounts for each asset type Angus held. For the marketable securities he identified 33 closed-end domestic equity funds, using Morningstar information, comparable to a majority of Angus' assets and concluded that the maximum discount was 21.1%, the minimum discount was 10.1%, and the mean discount was 15.6%. He determined that the lack of control discount applicable to the marketable securities held by Angus was 15.6%. He determined a 9% discount to the nonmarketable securities held by Palladium Investments and Grossman Investments, which was the lower quartile discount of the 13 closed-end corporate

[*27] bond funds that had similar investment criteria. He further determined a 12.3% discount to the promissory notes. A 5% lack of control discount was applied to the cash and cash equivalents held by Angus. He concluded that a lack of control discount for class B units was 12.6%. His analysis is summarized in the following table:

| Assets | Fair market value[1] | Percent of total assets | Selected discount (percent) | Weighted discount (percent) |
|---|---|---|---|---|
| Cash and cash equivalents | $3,832,184 | 12.4 | 5.0 | 0.6 |
| Marketable equity securities | 16,833,641 | 54.4 | 15.6 | 8.5 |
| Palladium Investments | 5,125,880 | 16.6 | 9.0 | 1.5 |
| Grossman Investments | 276,356 | 0.9 | 9.0 | 0.1 |
| Promissory notes | 4,862,038 | 15.7 | 12.3 | 1.9 |
| Total | 30,930,099 | 100.0 | | 12.6 |
| Overall selected discount | | | | 12.6 |

[1]The fair market values listed in this column differ from the fair market values determined in the VCG report because Mr. Frazier independently valued Angus' assets.

Next, Mr. Frazier used restricted stock studies to determine a lack of marketability discount. He concluded that restricted stock studies indicate a discount for lack of marketability applicable to the class B units in the range of

**[*28]** 23% to 34%. After analyzing attributes of the class B units with a focus on the holding period and lack of discretionary distributions, he determined a 25% discount for lack of marketability. His market approach valuation resulted in a fair market value of $20,234,131 for 9,980 class B units.

### b. Income Approach

As with Rabbit Mr. Frazier used the NICE method in his analysis of Angus. This method determines the annual required rate of return of the Angus class B units by looking for the one price that best satisfies the financial parameters of the willing buyer and the willing seller for all periods examined by the model. On the basis of the model he concluded that the 9,980 class B units had a fair market value of $19,474,526.

### c. Fair Market Value Conclusion

Mr. Frazier weighted equally the outcomes of the market and income approaches and concluded that the fair market value of the 9,980 class B units was $19,854,000. His valuation resulted in a total discount to Angus' NAV of approximately 35.68%. Mr. Frazier's analysis is summarized in the following table:

[*29]

| Approach | Fair market value | Weight (percent) | Total |
|---|---|---|---|
| Market approach | $20,234,131 | 50 | $10,117,066.00 |
| Income approach | 19,474,526 | 50 | 9,737,263.00 |
| Fair market value | | | 19,854,329.00 |
| Rounded | | | 19,854,000.00 |
| Per-unit value | | | 1,989.38 |

C.     Mitchell Reports' Valuations

In his valuation reports Mr. Mitchell sought the price at which a 99.8% noncontrolling interest would actually be bought or sold. According to Mr. Mitchell there was no empirical data on the sale of a 99.8% noncontrolling interest. His valuations were based upon the premise that the reasonable buyer of a 99.8% interest could be expected to seek to maximize his or her economic interest by consolidating ownership through the purchase of the 0.2% interest. Mr. Mitchell also contends that a willing buyer would consider the likelihood of purchasing the 0.2% interest.

Mr. Mitchell determined that a hypothetical willing seller would seek first to acquire the class A units for a premium. According to his reports and testimony, purchasing the class A units would result in consolidated control and

[*30] further maximize the value of the class B units by reducing any discount sought by a hypothetical willing buyer.

His valuation for Rabbit began with the NAV stipulated by the parties, and his valuation for Angus began with the NAV determined in the VCG report. To arrive at the appropriate premiums for the class A units of Rabbit and Angus he developed a theoretical application of the discounted NAV approach. He assigned to each entity's NAV a 10% lack of control discount and a 20% lack of marketability discount. This theoretical approach produced a 28% total discount from the NAVs. The discounted values were then used to estimate reasonable premiums that a person would pay to acquire the class A units. The reasonable premium amounts were deducted from the undiscounted NAV to determine the fair market valuation of the class B units.

1.     Valuation of Rabbit

Using his theoretical application of a discounted NAV Mr. Mitchell determined that Rabbit's class B units had a fair market value of $6,515,237. He stated that the undiscounted values were $18,134 for the class A units and $9,048,940 for the class B units. He calculated the theoretical discount by subtracting the discounted value from the undiscounted value. The theoretical discount of $2,533,703 was greater than the undiscounted value of $18,134

[*31] attributable to the class A units. According to Mr. Mitchell a willing seller of the 99.8% interest would be expected to seek to limit the dollar amount of any discount sought by a willing buyer by consolidating ownership. He further contends that a willing buyer would be willing to purchase the 99.8% interest for more than $6,515,237 because he or she would reasonably believe that he or she could pay a premium to acquire the class A units after acquiring the class B units.

In his reports Mr. Mitchell estimated that the purchase premium would be 5% of the theoretical dollar discount of $2,533,703. The 5% purchase premium equaled approximately $127,000, which he rounded to $130,000. He reduced Rabbit's class B units' undiscounted NAV of $9,048,940 by the $130,000 purchase premium to arrive at a value of $8,918,940 with a per-unit price of $893.68.

## 2. Valuation of Angus

For the valuation of Angus Mr. Mitchell used the same reasoning and methodology that he used to analyze Rabbit. Mr. Mitchell relied on the NAV of Angus determined by the VCG report. Using his theoretical application of a discounted NAV Mr. Mitchell determined that the Angus class B units had a fair market value of $22,972,854. He stated that the undiscounted values were $63,941 for the class A units and $31,906,742 for the class B units. He calculated

[*32] the theoretical discount as $8,933,888, which was greater than the undiscounted value of $63,941 attributable to the class A units.

Mr. Mitchell estimated that the purchase premium would be 5% of the theoretical dollar discount of $8,933,888. The 5% purchase premium equaled approximately $447,000, which he rounded to $450,000. He reduced the class B units' undiscounted NAV of $31,906,742[9] by the $450,000 purchase premium to arrive at a value of $31,456,742 with a per-unit price of $3,151.98.

V.    Analysis

When a gift of property is made, its value at the date of the gift shall be considered the amount of the gift. Sec. 25.2512-1, Gift Tax Regs. We do not engage in imaginary scenarios as to who a purchaser might be. Estate of Giustina v. Commissioner, 586 F. App'x 417, 418 (9th Cir. 2014), rev'g and remanding T.C. Memo. 2011-141. In Olson v. United States, 292 U.S. 246, 257 (1934), the Supreme Court explained:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value--a thing to be condemned in business transactions as well as in judicial ascertainment of truth. * * *

---

[9]This value is 99.80% of the NAV of $31,970,683.

**[*33]** Respondent's expert relies upon an additional action, the purchase of the class A units. Mr. Mitchell contends that the economic realities have to be taken into consideration and that the economic stake of the holder of a 99.8% interest of the class B units "dwarfs" that of the holder of the class A units. However, Margaret, the sole owner of the class A units, testified that she had no intention of selling the units. She further testified that if she ever sold the units she would demand a premium much higher than what was estimated in the Mitchell reports. If the class B units were ever sold outside the family, Margaret explained that she would require that she be paid a management fee.

We are looking at the value of the class B units on the date of the gifts and not the value of the class B units on the basis of subsequent events that, while within the realm of possibilities, are not reasonably probable, nor the value of the class A units. See id. In Succession of McCord v. Commissioner, 461 F.3d 614, 629 (5th Cir. 2006), rev'g and remanding McCord v. Commissioner, 120 T.C. 358 (2003), the Court of Appeals for the Fifth Circuit reasoned that there are three types of conditions along the "speculative" continuum: (1) a future event that is absolutely certain to occur; (2) a future event "that is not absolutely certain to occur, but nevertheless may be a 'more . . . certain prophec[y]'"; and (3) "a

**[*34]** possible, but low-odds, future event" which is "undeniably a 'less . . . certain prophec[y]'".

Mr. Mitchell's valuations relied on an additional action. He concluded that to determine the value of what a willing buyer would pay and what a willing seller would seek for the class B units, a premium to purchase the class A units has to be taken into account. Elements affecting the value that depend upon events within the realm of possibility should not be considered if the events are not shown to be reasonably probable. Olson, 292 U.S. at 257. The facts do not show that it is reasonably probable that a willing seller or a willing buyer of the class B units would also buy the class A units and that the class A units would be available to purchase. To determine the fair market values of the class B units we look at the willing buyer and willing seller of the class B units, and not the willing buyer and willing seller of the class A units.

Neither respondent nor Mr. Mitchell provided evidence to show support for his valuations. His reports did not include empirical data which back up his calculation of the 5% premium to purchase the class A units of either entity. He provided no evidence showing that his methodology was subject to peer review. Respondent cited no caselaw in support of Mr. Mitchell's methodology. Accordingly, we reject Mr. Mitchell's valuations of the class B units of Rabbit and

**[\*35]** Angus.  See Estate of Hall v. Commissioner, 92 T.C. at 340; Estate of Deputy v. Commissioner, T.C. Memo. 2003-176, slip op. at 20; Estate of Smith v. Commissioner, T.C. Memo. 1999-368, slip op. at 40.

In prior instances this Court has accepted the traditional asset-based methodology in valuing a minority interest.  In Estate of Kelley v. Commissioner, T.C. Memo. 2005-235, we approved a lack of control discount of 12% and lack of marketability discount of 23% for a 94.83% noncontrolling interest in a family-owned limited partnership whose assets were cash and certificates of deposit.  In Estate of Strangi v. Commissioner, 115 T.C. 478 (2000), aff'd in part, rev'd in part on other grounds, 293 F.3d 279 (5th Cir. 2002), we concluded that a 99% noncontrolling interest in a limited partnership with investments in cash and securities had a lack of control discount of 8% and a lack of marketability discount of 25%.

In his reports Mr. Mitchell theorized about the discounted NAV approach for the class B units of both Rabbit and Angus and concluded that the lack of control discounts were 10% and the lack of marketability discounts were 20%.  Mr. Mitchell stated in his reports that these discounts were illustrative estimates.  However, he further stated in his reports that these discounts were "not inconsistent with relevant market data and quantitative methodologies".  However,

**[\*36]** the reports provided no details on how the discounts were determined. We realize that these discounts were used only as part of the methodology in the Mitchell valuations. Without more information on how Mr. Mitchell arrived at his illustrative estimates, we do not believe that respondent provided enough evidence to support adopting such estimates for a lack of control discount of 10% and a lack of marketability discount of 20%.

Mr. Frazier combined two methodologies: the market approach and the income approach. The values of the class B units of Rabbit and Angus in the VCG reports were calculated using the market approach. The VCG reports determined a lack of control discount of 13.4% and 12.7% for Rabbit and Angus, respectively, and a lack of marketability discount of 25% for both Rabbit and Angus, which are within the range of several cases. See Estate of Strangi v. Commissioner, 115 T.C. 478; Estate of Kelley v. Commissioner, T.C. Memo. 2005-235; Peracchio v. Commissioner, T.C. Memo. 2003-280; Estate of Murphy v. United States, No. 07-CV-1013, 2009 WL 3366099 (W.D. Ark. Oct. 2, 2009). The methodology used in the VCG reports is similar to the methodology that Mr. Frazier used for his market-approach valuations. We are not convinced that the higher discount for lack of control for Rabbit and lower values in the Frazier reports should be substituted for the values that the parties stipulated and the

[*37] discounts petitioner provided in the VCG reports. See Estate of Hall v. Commissioner, 92 T.C. at 337-338; Estate of Deputy v. Commissioner, slip op. at 12 n.6. Furthermore, we conclude that the market approach is a reasonable method.

VI.    Conclusion

For Rabbit the NAV is the NAV stipulated by the parties. For Angus the NAV is the value determined in the VCG report. We are persuaded that those valuations are the most reliable. We have no reason to object to the discounts in VCG's reports. Therefore, we adopt the above-described valuations and lack of control discounts of 13.4% and 12.7% for Rabbit and Angus, respectively, and lack of marketability discounts of 25% for Rabbit and Angus.

We have considered all of the arguments raised by the parties, including the criticisms of each expert's reports, and, to the extent they are not addressed, we find them without merit.

Decision will be entered

under Rule 155.